UNITED STATES of America,

v.

Cecilio A. CARLYLE,

and

Gregory W. Thomas, Defendants.

Criminal No. 97–0081(PLF).

United States District Court,
District of Columbia.

May 8, 1997.

warrant on February 16, 1996. His family was across the street viewing what was transpiring.

William Blier, Mary Murphy, Assistant U.S. Attorneys, Washington, DC, for U.S.

Charles F. Daum, Arlington, VA, for Carlyle.

Mona Asiner, Washington, DC, for Thomas.

## OPINION AND ORDER

PAUL L. FRIEDMAN, District Judge.

This matter is before the Court on the government's motion to disqualify Charles F. Daum as counsel for defendant Cecilio A. Carlyle. The government argues that Mr. Daum has actual and potential conflicts of interest caused by his simultaneous representation of Mr. Carlyle in this case and another client in a separate criminal case in federal court in West Virginia.

The Court held an extensive hearing on April 2, 1997, where both parties presented argument on the motion. The Court subsequently appointed Hamilton P. Fox, III as counsel for Mr. Carlyle for the limited purpose of giving Mr. Carlyle independent legal advice on the disqualification issue.[1] It then held a subsequent hearing on April 10, 1997, during which the Court considered argument from all counsel and representations from

Mr. Fox, and conducted a detailed colloquy with defendant Carlyle regarding his desire to waive his right to conflict-free counsel. The Court denies the government's motion to disqualify Mr. Daum.

## I.  BACKGROUND

Cecilio Carlyle is charged, along with co-defendant Gregory Thomas, with conspiracy to distribute and possession with intent to distribute cocaine and cocaine base; the conspiracy allegedly covered the period from June 1996 through January 22, 1997. The government alleges that Mr. Carlyle is a lesser player in a wholesale narcotics supply conspiracy dealing in cocaine and cocaine base. Transcript of April 2, 1997 Hearing ("Tr.") at 6. The government asserts that the drug conspiracy in which Mr. Carlyle is allegedly involved revolves around a common foreign source of supply, which is linked to a "local connection" in the Washington D.C. metropolitan area. The local connection allegedly dealt directly with co-defendant Gregory Thomas, who in turn dealt with two individuals now cooperating with the United States. The government alleges that Mr. Carlyle dealt directly with one of the cooperating individuals to obtain cocaine or cocaine base for further distribution and sale in the District of Columbia, thereby representing the fourth link in the narcotics distribution chain. *Id.* at 6–7.

Mr. Daum is retained counsel for Mr. Carlyle. He has also been appointed as counsel for Gerard Thomas, who has been indicted in the United States District Court for the Northern District of West Virginia and charged with one count of conspiracy to distribute crack cocaine in a wholesale supply narcotics conspiracy. Gerard Thomas is one of Gregory Thomas' brothers. Donald Thomas, another brother of Gregory's and Gerard's, has been indicted in the West Virginia case as the lead defendant. The conspiracy alleged in West Virginia runs from 1990 to October 1996; the case against Gerard Thomas consists of allegations that some-

---

1.  Mr. Fox is a partner in the firm of Sutherland, Asbill & Brennan, a former Assistant United States Attorney, former Deputy Chief of the Organized Crime and Racketeering Section, Department of Justice, and former Associate Spe-

cial Counsel, House Committee on Standards of Official Conduct. He has served as a member, vice chair and chair of the District of Columbia Board on Professional Responsibility.

where in Maryland in 1992 an unidentified individual gave Gerard Thomas $15,000 earmarked for Donald Thomas.

### A. The Government's Arguments

The government seeks disqualification of Mr. Daum as counsel for Mr. Carlyle because it believes the West Virginia case is "substantially related" to the instant case in that both involve the same narcotics distribution chain. Govt's Mot. & Mem. to Disqualify at 2–3. The government contends that the same foreign supply distributes narcotics to the same local connection which in turn supplies Gregory Thomas, who distributes the narcotics in the Washington D.C. metropolitan area, and Gerard and Donald Thomas, who distribute narcotics in the Northern District of West Virginia. Tr. at 9–10. The government also has information that Gregory Thomas has a reliable customer in West Virginia and has engaged in narcotics activities with his brothers there. The government asserts that actual and potential conflicts of interest impede Mr. Daum's ability zealously to represent both Gerard Thomas in the West Virginia case and Cecilio Carlyle in the case before this Court involving Carlyle and Gregory Thomas, particularly if (as the government says is likely) Gregory Thomas will be charged in a superseding indictment in West Virginia.

Because this case is still in its nascent stages, the government can offer only predictions as to what conflicts might arise as a result of Mr. Daum's simultaneous representation of Cecilio Carlyle and Gerard Thomas. First, the government points to the conflict that may arise if either Cecilio Carlyle or Gerard Thomas agrees to cooperate with the United States. In that event, either one of Mr. Daum's clients ultimately may be requested to testify against the other regarding the general operation of the drug distribution conspiracy; the government argues that Mr. Daum, having received privileged information from both clients, would not ethically be able to cross-examine the testifying client effectively and zealously. This prediction of conflict is premised on the government's theory that the drug conspiracies in West Virgi-

nia and the Washington metropolitan area are one and the same.

The government concedes that Gerard Thomas and Cecilio Carlyle might never actually be charged with involvement in the same conspiracy, and it does not dispute Mr. Daum's representation that Gerard Thomas and Cecilio Carlyle have never met each other and do not know each other. It nevertheless cannot eliminate the possibility that one of Mr. Daum's clients might have information about the operation of the conspiracy and/or about co-conspirators that might implicate the other client. Pointing to Gregory Thomas' potential indictment in the West Virginia case and the fact that both cases allegedly share the same distribution network, the government argues that this is not an unlikely scenario. Govt's Mot. and Mem. to Disqualify at 4–6. The Court sees this as the most serious allegation of potential conflict.

A second potential scenario for conflict is related to the first. It could arise if Mr. Daum is called upon to give advice either to Gerard Thomas or to Cecilio Carlyle about the pros and cons of cooperating with the government. The government asserts that Mr. Daum would be unable to give independent advice and counsel to both clients about the various options available to them because he could not fairly counsel a client to cooperate with the government when that cooperation might be detrimental to another client or even to a client's brother. While, as a cooperating witness, Mr. Carlyle might not be able to offer information that directly implicates Gerard or Gregory Thomas in the conspiracy, the government assumes that Mr. Carlyle would be able to offer general information about the manner in which the narcotics conspiracy operates or about a particular narcotics transaction, thereby at least indirectly implicating either or both of the Thomas brothers or providing further evidence of the existence of a conspiracy. Tr. at 19–23. The converse would be true if it were Mr. Gerard Thomas who chose to cooperate with the government.

The government offers a third scenario of potential conflict based on the prediction that Mr. Daum will receive information from Ger-

ard Thomas that is beneficial to Mr. Carlyle (or vice versa), but that he will be unable to use it in representing Mr. Carlyle because of the attorney-client privilege. Caught in this situation, the government argues, Mr. Daum would be unable to represent both of his clients zealously and effectively. Were Mr. Daum to refrain from using the Thomas-generated information in assisting Mr. Carlyle because of ethical constraints, he would not be able to make full use of all available information helpful to Mr. Carlyle. By representing Mr. Carlyle in this constrained manner, Mr. Daum would violate his duty of loyalty to Mr. Carlyle. Furthermore, the government argues, it would be very difficult for Mr. Daum to make the distinction between information learned in the course of investigating Mr. Carlyle's case and information learned as a result of representing Gerard Thomas—in effect by attempting to build a "Chinese wall" within himself. While this scenario for potential conflict does not depend on the activity charged in this case and the case in West Virginia being part of the same conspiracy, it assumes that the information Gerard Thomas and Cecilio Carlyle currently possess overlaps because the respective drug conspiracies share the same distribution network or because of the familial relationship between Gerard and Gregory Thomas. Tr. at 13–16.

The fourth scenario offered by the government is based on the possibility that Gregory Thomas, Mr. Carlyle's co-defendant and Gerard Thomas's brother, will be called as a witness in this case, either for the defense or for the prosecution. The government asserts that Mr. Daum would be unable to cross-examine Gregory Thomas zealously because his other client, Gerard Thomas, is Gregory's brother, and that the competing family interest may affect his ability to vigorously represent Mr. Carlyle. Tr. at 17–19.[2]

### B. The Defendant's Position

Mr. Daum maintains that no actual or potential conflicts are implicated by his simulta-

neous representation of Gerard Thomas and Cecilio Carlyle. Mr. Daum first argues that despite the government's representations to the Court, the West Virginia and Washington, D.C. cases are not substantially related. The criminal conduct with which his respective clients are charged does not overlap either geographically or temporally. Furthermore, even if the two conspiracies share a common source of narcotics supply, as the government asserts, neither Gerard Thomas nor Cecilio Carlyle are being prosecuted as suppliers of narcotics to any of the co-conspirators; that is, neither defendant is being characterized as a supplier at the top of the conspiracy. Gerard Thomas is charged with allegedly receiving money, purported to be drug proceeds, on one occasion in 1992. Cecilio Carlyle is charged with receiving narcotics, several times in 1996 and early 1997, from a confidential informant. Neither defendant is charged with involvement in the supply side of the conspiracy. Thus, Mr. Daum argues, the cases are not related.

Mr. Daum also contends that no conflicts can or will arise as a result of his representation of both Mr. Carlyle and Gerard Thomas because neither defendant knows the other or knows of the other, and neither defendant has any information about the other, related or unrelated to the respective charges brought against them in either case. Mr. Carlyle's relationship with his immediate supplier, a cooperating witness whom Gregory Thomas allegedly supplied, did not afford him the opportunity to identify anyone in the drug distribution chain because the relationship was very limited—the supplier never divulged any information regarding the alleged conspiracy to Mr. Carlyle. Mr. Daum also represents to the Court that he personally has no information about Gregory Thomas, either from his brother Gerard or from Mr. Carlyle.

After reviewing all the motion papers and the transcript of the April 2 hearing, Hamil-

---

2. This scenario does not concern the Court. The fact that Gregory Thomas, a co-defendant in this case, is the brother of Gerard Thomas, a client of Mr. Daum's, does not strike the Court as a conflict that would affect Mr. Daum's ability to zealously represent Mr. Carlyle. Although the family

bond may influence the feelings that Gerard and Gregory Thomas have toward each other, there is no reason to believe that this bond would affect the judgment of Mr. Carlyle's attorney or implicate any of the ethical concerns suggested by the other scenarios.

ton P. Fox, III, independent counsel to Mr. Carlyle, also believes that the conflict scenarios offered by the government are too remote and hypothetical to require disqualification of Mr. Carlyle's counsel of choice. Nevertheless, at the Court's request, Mr. Fox met with Mr. Carlyle at length and advised him of the possible conflict scenarios offered by the government and the problems that might arise with respect to each. Having had independent advice on this matter, Mr. Carlyle told Mr. Fox that he wanted Mr. Daum to continue to represent him.

### C. Waivers

At the April 10 hearing, Mr. Carlyle was placed under oath and the Court engaged in an extensive colloquy with him regarding each potential for conflict that had been identified by the government. Mr. Carlyle represented to the Court that he still wanted Mr. Daum as his lawyer and that he voluntarily waives his right to conflict-free counsel. Mr. Carlyle stated that he likes the way Mr. Daum represents him and speaks to him and that he feels comfortable with Mr. Daum. In response to questions from the Court, Mr. Carlyle said that his desire to have Mr. Daum continue as his counsel has nothing to do with any financial reasons or fees that have already been paid to Mr. Daum.

At the Court's request, Mr. Daum also consulted with his other client, Gerard Thomas, and submitted a sworn affidavit from Mr. Thomas. The affidavit spells out a number of the factual scenarios that may develop, Mr. Thomas' understanding of how they may create conflicts of interest, his understanding that Mr. Daum cannot reveal to him information he receives from Mr. Carlyle or "in the course of representing Mr. Carlyle," his understanding of the limitations that may be placed on Mr. Daum's cross-examination of witnesses against him, and his understanding that the potential conflicts of interest may affect Mr. Daum's ability to enter into plea negotiations. Nevertheless, Mr. Thomas waived his right to conflict-free counsel:

"Having fully discussed my right to conflict free counsel with my attorney ... I hereby waive my right to conflict free counsel. By waiving my right to conflict free counsel, I am choosing to proceed with Mr. Daum as my attorney, despite the fact that a conflict of interest may arise in the future, because he is my attorney of choice and I am comfortable with him and trust him."

### II. DISCUSSION

[W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.

*Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988). Still, there is a strong presumption in favor of a defendant's counsel of choice. *Id.* at 160, 108 S.Ct. at 1697.

■ The government argues that despite Mr. Carlyle's presumptive right to counsel of his choice, Mr. Daum cannot provide effective assistance of counsel to Mr. Carlyle because his loyalties would be divided by his concurrent representation of Gerard Thomas in the West Virginia matter. Conceding that the Supreme Court has recognized a presumption in favor of a defendant's choice of counsel, the government nonetheless points out that the presumption may be "overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict." *Wheat v. United States,* 486 U.S. at 164, 108 S.Ct. at 1699. The government contends that the potential for conflict in this case is serious enough to warrant the disqualification of Mr. Daum as Mr. Carlyle's counsel, over the objections of a fully-advised defendant prepared to waive his right to conflict-free counsel.

The Court finds that there is no actual conflict of interest in this case.[3] Considering

---

**3.** The government makes the categorical argument that a lawyer can never represent two defendants charged with involvement in the same conspiracy. The Court rejects this argument. *See Wheat v. United States,* 486 U.S. at 159–60, 108 S.Ct. at 1697 ("While 'permitting a single attorney to represent codefendants ... is not *per se* violative of constitutional guarantees of

the speculative nature of the government's predictions of potential conflicts down the road and the alleged relationship between this case and the West Virginia case, the Court also concludes that Mr. Daum should be able to discharge effectively his responsibilities to both Gerard Thomas and Cecilio Carlyle. Moreover, even if there were a stronger potential for conflict, the Court concludes that Mr. Carlyle is free to waive his right to conflict-free counsel and that he has knowingly and voluntarily done so. While certainly there is an independent interest in the integrity of the proceedings before the Court, *see United States v. Childress,* 58 F.3d 693, 735 (D.C.Cir.1995), in the circumstances presented here the Court exercises its discretion to accept the waiver and permit Mr. Carlyle to proceed with Mr. Daum, confident that he can receive the effective representation of counsel that he is guaranteed by the Constitution.

The possibility that either of Mr. Daum's clients might agree to cooperate with the government, and in turn, have to testify against the other, is the type of conflict that would make it difficult for Mr. Daum to effectively represent the best interests of both clients. The Court credits Mr. Daum's representation that neither Mr. Carlyle nor Gerard Thomas has information about the other, and that Mr. Daum himself currently has no information from either client that relates to both the instant case and the West Virginia case. But Mr. Daum cannot predict the myriad paths these cases might take any better than the Court can, particularly when at this stage the government presumably has more information about the conspiracies and their participants. As the Supreme Court has pointed out:

effective assistance of counsel,' ... a court confronted with and alerted to possible conflicts of interest must take adequate steps to ascertain whether the conflicts warrant separate counsel.") (quoting *Holloway v. Arkansas,* 435 U.S. 475, 482, 98 S.Ct. 1173, 1177, 55 L.Ed.2d 426 (1978)); *see id.* at 163-64, 108 S.Ct. at 1699–1700. Even in the case of an actual conflict, voluntary, knowing and intelligent waivers from both clients may sufficiently cure the problem.

It is a rare attorney who will be fortunate enough to learn the entire truth from his own client, much less be fully apprised before trial of what each of the Government's witnesses will say on the stand. A few bits of unforeseen testimony or a single previously unknown or unnoticed document may significantly shift the relationship between multiple defendants.

*Wheat v. United States,* 486 U.S. at 162–63, 108 S.Ct. at 1698–99. Nor does the Court believe that Mr. Daum could fairly create within himself a "Chinese wall" that could segregate in his mind related information obtained from different clients or in different cases. Nevertheless, as Justice Stevens has pointed out, "the courts can generally rely on the sound discretion of members of the bar to treat privileged information with appropriate respect.... The risk that an item of confidential information might be misused does not create a conflict of interest which disqualifies an attorney...." *United States v. Jeffers,* 520 F.2d 1256, 1265 (7th Cir.1975), *cert. denied,* 423 U.S. 1066, 96 S.Ct. 805, 46 L.Ed.2d 656 (1976).

Despite the potential that an actual conflict of interest might emerge later in this case, that possibility has been fully considered by both the Court and the defendant. After receiving independent advice from experienced counsel having no stake in an ongoing attorney-client relationship or the fees that may be generated therefrom, Mr. Carlyle has stated that he realizes that such conflicts could arise in the future and that he nevertheless wishes to waive his right to conflict-free counsel and proceed with Mr. Daum. Mr. Carlyle expressed this waiver after engaging in a comprehensive Rule 11–type colloquy with the Court as contemplated by *United States v. Garcia,* 517 F.2d 272 (5th Cir.1975).[4] While Mr. Carlyle was under

4. In its colloquy with a defendant, a court must, and this Court did
    personally and forthrightly advise [the defendant] of the potential dangers of representation by counsel with a conflict of interest. The defendant must be at liberty to question the district court as to the nature and consequences of his legal representation. Most significantly, the court should seek to elicit a narrative response from [the] defendant that he has been advised of his right to effective representation, that he understands the details

oath, the Court described all of the conflict scenarios presented by the government and reminded Mr. Carlyle of his right to a lawyer who is free of any actual or potential conflicts of interest. The Court also confirmed that Mr. Carlyle had had an adequate opportunity to discuss his right to conflict-free counsel with Hamilton P. Fox, III and, after receiving his independent advice and counsel, that he still wanted Mr. Daum to represent him. The Court then specifically asked Mr. Carlyle why he wanted Mr. Daum as his counsel, in light of the various conflicts that could arise as the case proceeded, and Mr. Carlyle stated that he was "free and comfortable" with Mr. Daum as his attorney and that he likes the way Mr. Daum represents him and speaks to him.[5]

▆▆ "A criminal defendant may waive his right to conflict-free counsel if his waiver is voluntary and intelligent," *United States v. Plewniak*, 947 F.2d 1284, 1287 (5th Cir.1991) (citing *United States v. Garcia*, 517 F.2d at 277).[6] Of course, "[t]he determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *United States v. Garcia*, 517 F.2d at 277 n. 5 (citing *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)); *see In re Paradyne Corp.*, 803 F.2d 604, 611 (11th Cir.1986). Although the Supreme Court has held that a district court has discretion to refuse to allow a possibly-conflicted attorney simultaneously to represent two defendants in a drug conspiracy

case, the Court also emphasized that "[o]ther district courts might have reached differing or opposite conclusions with equal justification, but that does not mean that one conclusion was 'right' and the other 'wrong.'" *Wheat v. United States*, 486 U.S. at 164, 108 S.Ct. at 1699.

In the circumstances of this case, the Court is satisfied that Mr. Carlyle has made a voluntary, knowing and intelligent waiver of his right to conflict-free counsel. Despite the government's predictions that actual conflicts might develop later, the scenarios presented to the Court are too attenuated at this stage to overcome the presumption in favor of Mr. Carlyle's right to counsel of choice and of his knowing waiver of his right to conflict-free counsel. The fact that Gerard Thomas also has submitted a detailed affidavit under oath, stating that he has been advised of the potential for conflicts of interest created by Mr. Daum's simultaneous representation of Mr. Thomas and Mr. Carlyle, fortifies the Court in its judgment that it is appropriate to accept Mr. Carlyle's waiver in this case. *See United States v. NYNEX Corp.*, 788 F.Supp. 16, 22 (D.D.C.1992) (accepting affidavits from parties potentially affected by any future conflicts to support an effective waiver of the right to conflict-free counsel). As Judge Harold Greene noted in a similar case:

> To be sure, the government advances various scenarios in its reply papers, which, it is suggested, could conceivably give rise to conflict problems. However, not only are these predictions of future events extreme-

of this attorney's possible conflict of interest and the potential perils of such a conflict, that he has discussed the matter with his attorney or if he wishes with outside counsel, and that he voluntarily waives his Sixth Amendment protections. It is, of course, vital that the waiver be established by "clear, unequivocal, and unambiguous language."
*United States v. Garcia*, 517 F.2d at 278 (citation omitted).

**5.** At the government's request, the Court revisited with Mr. Carlyle the fact that if Mr. Daum were to gain any privileged information from Gerard Thomas, he would not be able to use that information to help Mr. Carlyle. Mr. Carlyle expressed to the Court again that he understood that this conflict could arise and that he never-

theless wanted Mr. Daum as his lawyer and that he wished to waive his right to conflict-free counsel.

Also at the request of the government, the Court asked Mr. Carlyle whether his decision to keep Mr. Daum as his lawyer was in any way financially motivated, for example, because certain fees had already been paid to Mr. Daum. In answer to this inquiry, Mr. Carlyle stated under oath that his desire to have Mr. Daum represent him was completely independent of any financial concerns.

**6.** The ability of a defendant to waive his right to conflict-free counsel remains intact after the Supreme Court's decision in *Wheat*. *United States v. Plewniak*, 947 F.2d at 1288.

ly conjectural, but they also neglect the overriding interest of the defendant herein and its right under the Sixth Amendment to representation by counsel of its own choice.... The Supreme Court has stated that there is a presumption in favor of a defendant's choice of counsel....

What were contrived as protections for the accused should not be turned into fetters.... When the administration of the criminal law ... is hedged about as it is by the Constitutional safeguards for the protection of an accused, to deny him in the exercise of his free choice the right to dispense with some of these safeguards ... is to imprison a man in his privileges and call it the Constitution.

*United States v. NYNEX Corp.*, 788 F.Supp. at 22 (footnote and citations omitted).

For the foregoing reasons, it is hereby ORDERED that the government's motion to disqualify Charles F. Daum as counsel for defendant Cecilio A. Carlyle be DENIED.

SO ORDERED.